## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,    Case No. 19-cr-320 (SRN/LIB)

          Plaintiff,

v.    **REPORT AND RECOMMENDATION**

Wayne Michael Fisher,

          Defendant.

       This matter comes before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. § 636 and Local Rule 72.1, upon Defendant Wayne Michael Fisher's (hereinafter "Defendant") Motion to Dismiss the Indictment, [Docket No. 22], and Defendant's Motion to Suppress Evidence. [Docket No. 25]. The Court held a motions hearing on February 10, 2020, regarding the Defendant's pretrial motions.[1] At the motions hearing, the parties requested, and were granted, the opportunity to submit supplemental briefing. Upon the completion of that briefing, Defendant's Motion Dismiss the Indictment, [Docket No. 22], and his Motion to Suppress Evidence, [Docket No. 25], were taken under advisement.

       For reasons discussed herein, the undersigned recommends that Defendant's Motion to Dismiss the Indictment, [Docket No. 22], be **DENIED**, and the undersigned further recommends that Defendant's Motion to Suppress Evidence, [Docket No. 25], be **DENIED**.

---

[1]The Court addressed the Defendant's pretrial motions for discovery and production of evidence by separate Order. [Docket No. 34].

I.     **Background and Statement of Facts**

   **A.  Background**

   Defendant is charged with one (1) count of conspiracy to distribute methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846, as well as, two (2) counts of possession with intent to distribute a controlled substance, in violation of 21 U.S.C. § 841(a)(1); 21 U.S.C. § 841(b)(1)(A); and 18 U.S.C. § 2. (Indictment [Docket No. 1]).

   **B.  Facts**

   The record presently before the Court indicates that on July 26, 2016, the United States District Court for the District of Minnesota issued a warrant commanding law enforcement to arrest Defendant. (Gov't Ex. 2).[2] The July 26, 2016, arrest warrant provided that Defendant was accused of violating the terms of his supervised release. (Id.).

   After the issuance of this arrest warrant, Special Agent Robert Fraik (hereinafter "SA Fraik") of the Minnesota Bureau of Criminal Apprehension, on July 26, 2016, drafted an "application and affidavit" for an "Order and Tracking Warrant authorizing the installation and use of: a pen register, trap and trace device including caller identification, electronic tracking device, and/or cellular tower location and service information, including services such as Global Positioning System technology, precision location related technologies, and/or a tracking warrant" on a telephone number believed to belong to Defendant's cellular telephone. (Gov't Ex. 3).[3] SA Fraik's application provided that the tracking warrant was needed to aid in conducting a criminal investigation of Defendant "in connection with possible violations of state

---

[2] Government's Exhibit 2 is the July 26, 2016, arrest warrant. At the Motions Hearing, the Government, without objection, offered the arrest warrant into evidence. (February 10, 2020, Motions Hearing, Digital Recording at 2:14–2:16 p.m.). Defendant does not challenge the issuance or validity of this arrest warrant.

[3] Government's Exhibit 3 is the "application and affidavit" application, supporting affidavit, and "Findings, Order, and Tracking Warrant" now at issue. At the Motions Hearing, the Government, without objection, offered the "application and affidavit" application, supporting affidavit, and "Findings, Order, and Tracking Warrant" into evidence. (February 10, 2020, Motions Hearing, Digital Recording at 2:15–2:18 p.m.).

and federal law relative to an outstanding arrest warrant for a supervised release violation." (Id. at 2). According to the materials submitted in support of the issuance of the warrant, it was believed that subjects of the investigation were using the subject telephone number in furtherance of those violations, and therefore, the information obtained through the requested tracking warrant would be relevant to the investigation. (Id. at 2).

SA Fraik specified that he had learned that an "outstanding felony level arrest warrant" had been "issued by the United States District Court for the District of Minnesota." (Id.). SA Fraik also provided a "Statement of Probable Cause" in which he asserted that there was "reason to believe that probable cause exist[ed] that the person who possess[ed]" the subject "electronic device [was] committing, ha[d] committed, or [was] about to commit a crime." (Id.). In support of that assertion of probable cause SA Fraik attested that he had learned of the Federal warrant authorizing Defendant's arrest; that Defendant was on supervised release; that Defendant's last known phone number, as provided by the probation officer assigned to Defendant's case, was the phone  number set forth in the requested tracking warrant; and that Defendant's probation officer had communicated with Defendant using said telephone number within the seven days prior to SA Fraik's application for the tracking warrant. (Id.). SA Fraik further attested that locating the telephone using the subject phone number would "likely provide fruitful information as to the whereabouts of" Defendant and "aid law enforcement in locating and arresting" Defendant "for a felony level arrest warrant." (Id. at 3).

After swearing SA Fraik to the statements made in his application, on July 26, 2016, a District Court Judge for the State of Minnesota, Ninth Judicial District, County of Beltrami, issued a "Findings, Order, and Tracking Warrant" authorizing the request contained in SA Fraik's application. (Id. at 6). Specifically, the Judge determined that there was "reasons to

believe that . . . probable cause exist[ed] that a crime has been, or [was] about to be committed by a person in possession of an electronic device" subject to the warrant. (Id. at 7). The Judge noted that the information likely to be obtained was related to Defendant's then outstanding federal arrest warrant. (Id. at 8).

On July 27, 2016, Minnesota State Highway Patrol Trooper Nicholas Otterson (hereinafter "Trooper Otterson")[4] received several phone calls from SA Robert Fraik. (February 10, 2020, Motions Hearing, Digital Recording at 2:28–2:38 p.m.). During these phone conversations, Trooper Otterson spoke with SA Fraik and Jerry Wilhelm, a "gang investigator from the [Department of Corrections]," about a "vehicle and individual they were looking for," and it was requested that Trooper Otterson attempt to stop the vehicle once it was located. (Id. at p.m.).

Trooper Otterson was provided with a description of the vehicle; the license plate of the vehicle; the name of the individual, who is the Defendant in the present action; and a description of Defendant, including pictures of Defendant and Defendant's tattoos. (Id.). Trooper Otterson was informed that Defendant was believed to be "the highest ranking Native Mob member in the State of Minnesota"; had allegedly "assaulted somebody with a firearm" on July 25, 2016; and was then presently thought to be involved with transporting a quantity of methamphetamine "from the metro area back to the reservation . . . ." (Id.). Trooper Otterson was informed that there was a federal warrant issued for Defendant's arrest, and Defendant was believed to be in possession of a pistol that he allegedly used in an assault two days prior. (Id.).

As he received this information, Trooper Otterson was driving to Motley, Minnesota, to watch for and intercept the vehicle and Defendant. (Id.). While driving to Motley, Minnesota, Trooper Otterson was informed that officers had sighted the suspected vehicle in the area in

---

[4] Trooper Otterson is a certified narcotics detection K-9 handler. Trooper Otterson's K-9 partner is named Busa.

which they knew Defendant's phone to be located. (Id.). Trooper Otterson had been advised that authorities knew the location of Defendant's phone based on a "pen order to trap and trace the phone's movements." (Id.).

While driving into Motley, Minnesota, Trooper Otterson observed a vehicle matching the description he had been given with a license plate matching the plate number he had been given. (Id.). Trooper Otterson also observed that, based on his training and experience, the tint of the side windows of the vehicle was darker than permitted by Minnesota law. (Id.).

Upon first observing the vehicle, Trooper Otterson executed a U-turn, and he proceeded to follow the vehicle. (Gov't's Ex. 1).[5] Trooper Otterson then activated his emergency lights to pull over the vehicle, a Chrysler 300. (Id.). After the Chrysler 300 pulled to the side of the road, Trooper Otterson approached the passenger's side of the vehicle, informed the occupants that he had stopped the vehicle for the "dark tint," and he asked the driver for his driver's license and proof of insurance. (Id. at 1:30–2:30). At the February 10, 2020, Motions Hearing, Trooper Otterson testified that he observed a male driver; a male passenger in the front seat who, based on the description he had been provided, Trooper Otterson identified as Defendant; and a female passenger laying down in the back seat. (February 10, 2020, Motions Hearing, Digital Recording at 2:38–2:45 p.m.). Trooper Otterson further observed that the vehicle contained several air fresheners and there were multiple cell phones in plain view. (Id.). Trooper Otterson testified that he also observed the "molding" around the vehicle's dash radio and console "appeared loose" which based on his training and experience he believed to indicate that contraband may have been hidden behind those dash panels of the vehicle. (Id.).

---

[5] Government's Exhibit 1 is a copy of Trooper Otterson's dashcam video during the July 27, 2016, traffic stop now at issue. At the Motions Hearing, the Government, without objection, offered the video into evidence. (February 10, 2020, Motions Hearing, Digital Recording at 2:12–2:15 p.m.).

The driver, who was later identified as Zebadiah J. Gartner, provided a driver's license, however, he stated that there was no insurance on the vehicle. (Gov't's Ex. 1 at 2:30–4:30). The driver informed Trooper Otterson that he had recently purchased the vehicle. (Id.). Although the driver of the vehicle provided a title to the vehicle, the title was not in the name of the driver, and the driver stated that he did not know the person named on the title, nor did he know the person who had signed the back of the title.

Trooper Otterson then asked the driver to join him in the front seat of the patrol vehicle while Trooper Otterson processed the information provided. (Id.). Trooper Otterson then left his patrol vehicle to inform Defendant that there was an outstanding federal arrest warrant in Defendant's name. (Id. at 3:00–8:30). Trooper Otterson then handcuffed Defendant, and Trooper Otterson placed the Defendant in the rear seat of his patrol vehicle. (Id.). Trooper Otterson directed the female passenger to stand in front of his patrol vehicle, and Trooper Otterson asked her for her name. (Id.). She provided the name Danielle; however, she was later identified as Morningstar Webster. (Id.).

Upon processing the identification information provided by the driver, Trooper Otterson discovered the driver also had an outstanding warrant for his arrest, and he was placed into handcuffs pending the verification of the arrest warrant. (Id. at 8:30–14:45). Trooper Otterson thereafter spoke separately to the driver and the female passenger regarding their activities while he awaited confirmation of the warrant authorizing the arrest of the driver. (Id. at 9:30–26:00). The driver and the female passenger each provided different descriptions of the activities of the vehicle occupants that day. (Id.).

Subsequently, a second officer arrived on the scene, and the female passenger was placed in handcuffs based on an outstanding warrant issued for the false name she initially provided to

Trooper Otterson because law enforcement had not yet learned her true identity. (Id. at 15:00–27:00). The second officer then directed the female passenger to his patrol vehicle parked behind Trooper Otterson's patrol vehicle. (Id.).

Trooper Otterson then took his K-9 partner, Busa, out of his Patrol Vehicle. (Id. at 28:00–30:00). Trooper Otterson testified that while walking Busa around the exterior of the vehicle, Busa "alerted" twice. (February 10, 2020, Motions Hearing, Digital Recording at 2:54–2:56 p.m.). Specifically, Busa alerted at the exterior of the passenger door seam and at the open window seam. Trooper Otterson led Busa around the outside of the vehicle a second time, and Busa alerted at the same locations. (Id.). On the second pass around the Chrysler 300, Busa jumped into the front-passenger window of the Chrysler 300 scratching with both paws at the center console which, according to Trooper Otterson testimony, is behavior indicating the strongest source of the odor Busa detected. (Id.). Trooper Otterson then placed Busa back into the patrol vehicle. (Gov't's Ex. 1 at 26:00–27:00).

Upon searching the center console of the Chrysler 300, Trooper Otterson located a bag of pills, other drug paraphernalia, and the identification card of the female passenger which identified her, not as Danielle, but as Morningstar Webster. (Id. at 30:00–59:50). Trooper Otterson testified that the pills, later identified as Gabapentin pills, were "wedged down" by the seat in which Defendant had been sitting. (February 10, 2020, Motions Hearing, Digital Recording at 2:55–2:57 p.m.). Trooper Otterson further testified that, in the vehicle's glove box, he located "a used marijuana pipe" and a "folded piece of paper with a line of marijuana sprinkled" inside the paper. (Id.).

Trooper Otterson proceeded to search the remainder of the Chrysler 300 during which he located a digital scale near where the female passenger's feet were located, and he located a

second digital scale in the trunk of the vehicle. (Id. at 30:00–59:50). Trooper Otterson testified that he observed a "clear and crystalline residue" on the digital scale. (February 10, 2020, Motions Hearing, Digital Recording at 2:55–2:57 p.m.). During his search of the vehicle, Trooper Otterson observed several areas where the vehicle's interior trim appeared loose and scratched which Trooper Otterson testified he believed to indicate that the trim had been tampered with. (February 10, 2020, Motions Hearing, Digital Recording at 2:38–2:45 p.m., 2:56–2:58 p.m.).

Trooper Otterson testified that, after he completed his search of the vehicle, he was informed that Cass County authorities "did not want to" execute the warrant on the driver, Mr. Gartner, and therefore, Mr. Gartner was not arrested. (February 10, 2020, Motions Hearing, Digital Recording at 2:55–2:59 p.m.). Trooper Otterson then issued a traffic citation to Mr. Gartner for driving after his license had been suspended.

The Chrysler 300 was placed on a tow truck to be impounded. Trooper Otterson then tested the window tint of the Chrysler 300. (Gov't Ex. 1 at 1:00–1:15). At the Motions Hearing, Trooper Otterson testified that the tint measured at permitting only 35% of light transmittance which is below the legal minimum required limit of 50% light transmittance. (February 10, 2020, Motions Hearing, Digital Recording at 2:28–2:38 p.m., 2:58–3:00 p.m.). Trooper Otterson testified that he did not issue a ticket for the tint violation at that time because he was unaware from the title provided who owned the vehicle. (February 10, 2020, Motions Hearing, Digital Recording at 2:55–3:00 p.m.).

Defendant and Ms. Morningstar, having been placed under arrest based on their outstanding arrest warrants, were then transported to the Crow Wing County jail facility.

(Gov't's Ex. 1 at 1:15–1:43). Trooper Otterson transported both Defendant and Ms. Morningstar. (Id.).

The Chrysler 300 was towed, and it was taken to a "locked secure impound lot." (February 10, 2020, Motions Hearing, Digital Recording at 3:00–3:05 p.m.) The following day, the Chrysler 300 was towed to Trooper Otterson's office where it was placed into an evidence garage. (Id.). Trooper Otterson testified that he and SA Fraik had a discussion regarding their suspicions that additional narcotic contraband was located inside the Chrysler 300. (Id.). Specifically, Trooper Otterson informed SA Fraik that he believed the marijuana was placed into the vehicle's console to mask the odor of other drugs, and therefore, Trooper Otterson wished to "let the vehicle sit in the garage with the windows down and the doors open" to "air out" the vehicle so Busa "could be utilized to more accurately [again] search the car." (Id.).

During the time the vehicle was being allowed to "air out," Trooper Otterson, drafted an application for a search warrant to search the Chrysler 300 because he thought receiving a search warrant "would be best." (Id.). Trooper Otterson's July 30, 2016, application sought a search warrant authorizing law enforcement to search and seize evidence found within the Chrysler 300 which was the subject of the traffic stop described above and which was then currently being stored in a secure garage at the State Patrol Office. (Gov't's Ex. 4).[6] Trooper Otterson's application for a search warrant for the Chrysler 300 included all of the information the Special Agents had provided to Trooper Otterson, including the report of a Confidential Informant to the Special Agents, that Defendant would be transporting a large quantity of methamphetamine to northern Minnesota on July 27, 2016. (Id. at 2). Trooper Otterson's affidavit in support of the application also included a summary of his actions from the time he was contacted by the Special

---

[6] Government's Exhibit 4 is the warrant application, supporting affidavit, and warrant now at issue. At the Motions Hearing, the Government, without objection, offered the warrant application, supporting affidavit, and warrant now at issue into evidence. (February 10, 2020, Motions Hearing, Digital Recording at 2:14–2:20 p.m.).

Agents through the traffic stop, as described above, including a description of the K-9 sniff of the vehicle and Trooper Otterson's observations of loose panels and trim. (Id. at 2–4). Trooper Otterson's affidavit further provided that, in his search of the vehicle, he had "found approximately 1.5 grams of NIK Positive Marijuana"; "a used pipe"; a "bag of unscheduled Gabapentin pills"; and a "digital scale that NIK tested positive for METHAMPHETAMINE residue." (Id. at 4) (capitalization in original).

On July 30, 2016, the Honorable Kristine DeMay, District Court Judge for the State of Minnesota, Ninth Judicial District, County of Crow Wing, determined that probable cause existed to support the issuance of the July 30, 2016, vehicle search warrant now at issue. (Id. at 6–7). The search warrant authorized the search of the Chrysler 300 while it was impounded. (Id.).

After he received the July 30, 2016, search warrant, Trooper Otterson went to search the Chrysler 300. (February 10, 2020, Motions Hearing, Digital Recording at 3:02–3:06 p.m.). Trooper Otterson began by removing all the items from inside the car, and then he brought Busa into the garage with the Chrysler 300. (Id.). When Busa was "let off his lead," he "ran straight to the subwoofers . . . and started alerting and then [he] stuck his whole snout and head inside the opening of the subwoofer and then started scratching there," which Trooper Otterson testified was an indicator behavior that there were narcotics located in the subwoofer. (Id.). Trooper Otterson then located "two garbage bags or packages inside the subwoofers." (Id.). At the February 10, 2019, Motions Hearing, Trooper Otterson testified that the substance inside the packages appeared to be methamphetamine. (Id.).

On August 3, 2016, SA Fraik drafted an application for a search warrant authorizing law enforcement to download and search the contents of two cellular telephones seized from the

occupants of the Chrysler 300 during the July 27, 2016, traffic stop described above. (Gov't's Ex. 5).[7] SA Fraik's affidavit in support of his application for a search warrant included the details of the investigation described above, including the arrest warrant issued for Defendant's arrest; the circumstances of the July 27, 2016, traffic stop; Trooper Otterson's initial locating of narcotics related items in the Chrysler 300 and his subsequently locating approximately 479 grams of methamphetamine during the later July 30, 2016, search of the Chrysler 300 pursuant to a warrant; and the seizure of the two, subject cellular telephones during the traffic stop. (Id. at 2–3). In his affidavit, SA Fraik attested that, based on his training and experience, the quantity of methamphetamine recovered from the Chrysler 300 was consistent with "controlled substance trafficking and sales rather than" personal use, and persons engaged in the trafficking and sales of controlled substances often engage in conversations with "drug suppliers and drug customers via phone, e-mail, and other electronic media," and the information obtained from the two, subject cellular phones would assist law enforcement in their investigation. (Id. at 3).

On August 3, 2016, the Honorable Shari Schluchter, District Court Judge for the State of Minnesota, Ninth Judicial District, County of Beltrami, determined that probable cause existed to support the issuance of the August 3, 2016, search warrant now at issue for the phones. (Id. at 4). SA Fraik executed the search warrant upon the two cellular telephones on August 5, 2016. (Id. at 5).

On June 27, 2019, Criminal Investigator Ronald Leyba (hereinafter "CI Leyba") of the Red Lake Police Department drafted an application for a search warrant authorizing law enforcement to search a residence identified by address and referred to locally as the "Gitch" residence; the persons of Richard Allen Clark, Sr. and Dezirae Rose Desjarlait; and an "SUV

---

[7] Government's Exhibit 5 is the warrant application, supporting affidavit, and warrant now at issue. At the Motions Hearing, the Government, without objection, offered the warrant application, supporting affidavit, and warrant now at issue into evidence. (February 10, 2020, Motions Hearing, Digital Recording at 2:15–2:19 p.m.).

with Leech Lake plate 1123." (Gov't Ex. 6).[8] CI Leyba's affidavit in support of his application for a search warrant detailed his ongoing investigation of the sale of narcotics at the "Gitch" residence by the persons described in the affidavit, including the circumstances regarding a controlled purchases of narcotics arranged and witnessed by a Confidential Informant. (Id. at 3).

On June 27, 2019, a Judge of the Tribal Court for the Red Lake Reservation determined that probable cause existed to support the issuance of the June 27, 2019, search warrant now at issue. (Id. at 5–6). The Red Lake Search Warrant was executed on June 27, 2019.

Defendant was present at the subject residence when the June 27, 2019, Red Lake Search Warrant was executed. (February 10, 2020, Motions Hearing, Digital Recording at 2:09–2:13 p.m.). Defendant was arrested at that time, and he was subsequently charged with an offense in Red Lake Tribal Court. (Id.).

After being charged in Red Lake Tribal Court, Defendant pled guilty in that Court to the offense of possession with intent to distribute a controlled substance. (Id.). At the February 10, 2020, Motions Hearing, Defendant testified that he believed the offense to which he pled guilty was related to the methamphetamine found at the execution of the June 27, 2019, Red Lake Search Warrant. (Id.). Defendant testified that he was "promised that it would stay on tribal grounds and tribal courts, that they would not turn it over to any state or federal government official and they would keep the case in tribal court . . . ." (Id.).

**II.    Defendant's Motion to Dismiss the Indictment. [Docket No. 22].**

---

[8] Government's Exhibit 6 is the Red Lake warrant application, supporting affidavit, and warrant now at issue. At the Motions Hearing, the Government offered the warrant application, supporting affidavit, and warrant now at issue into evidence. (February 10, 2020, Motions Hearing, Digital Recording at 2:17–2:23 p.m.). Defendant objected to Government's Exhibit 6 on the basis of a purported lack of foundation. (Id.). The Court provisionally admitted Government's Exhibit 6. (Id.). In the analysis below, the Court further addresses the admittance of Government's Exhibit 6 into evidence.

Defendant's Motion to Dismiss seeks an Order of this Court dismissing Count III of the Indictment. (Def.'s Mem., [Docket No. 31], at 13).[9] Defendant asserts that the basis for this request is "the Double Jeopardy and Due Process Clauses of the Fifth Amendment, and" his "previous prosecution in Red Lake Tribal Court for the same crime charged in Count 3 of the Indictment." (Id.). Defendant candidly acknowledges that the relief requested "appears" to be foreclosed by the United States Supreme Court's decision in United States v. Lara, 541 U.S. 193 (2004); however, Defendant wishes to persist in his request for the explicit purpose of raising the issue again before the Eighth Circuit Court of Appeals and the United States Supreme Court. (Def.'s Mem., [Docket No. 31], at 13–14).

The Supreme Court of the United States has indeed previously held that when an Indian Tribe criminally prosecutes a nonmember Indian, the Indian tribe is exercising its inherent authority as a sovereign and not exercising any "federal power." See, United States v. Lara, 541 U.S. 193 (2004). Thus, the "Double Jeopardy Clause does not prohibit the Federal Government from proceeding with" the prosecution of federal offenses. See, United States v. Lara, 541 U.S. 193 (2004).

Defendant does not here specifically assert whether or not he is a member of the Red Lake Indian Tribe; however, he does assert that the relief denied in Lana is the exact relief he requests here. The relief requested in Defendant's Motion to Dismiss is precluded by the United States Supreme Court precedent in Lana.

---

[9] In Count III of the Indictment, Defendant is charged with one count of possession with intent to distribute a controlled substances, and it alleges that on June 27, 2019, Defendant "did knowingly and intentionally possess with intent to distribute 50 grams or more of methamphetamine (actual) . . . ." (Indictment [Docket No. 1]). This alleged conduct is related to the June 27, 2019, search of the "Gitch" residence and the contraband found during the search of that residence. As a result of the discovery of that contraband, Defendant was previously charged in Tribal Court with the offense of possession with intent to distribute a controlled substance, and Defendant ultimately pled guilty to that offense in Tribal Court.

Therefore, the undersigned recommends that Defendant's Motion to Dismiss, [Docket No. 22], be **DENIED**.

### III.     Defendant's Motion to Suppress Evidence. [Docket No. 25].

Defendant next moves the Court for an order suppressing any evidence obtained as a result of the July 26, 2016, location monitoring search warrant; the July 27, 2016, roadside search of the Chrysler 300 during a traffic stop; the July 30, 2016, search of the Chrysler 300 while it was impounded; the August 5, 2016, search of the two cellular telephones previously seized during the aforementioned traffic stop; and the June 27, 2019, execution of the Red Lake Search Warrant at the "Gitch" residence. (Def.'s Mot. [Docket No. 25].

### A.  Standard of Review

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and that "no warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. Const. Amend. IV. The Eighth Circuit has held that "[a]n affidavit establishes probable cause for a warrant if it sets forth sufficient facts to establish that there is a fair probability that contraband or evidence of criminal activity will be found in the particular place to be searched." United States v. Mutschelknaus, 592 F.3d 826, 828 (8th Cir. 2010) (internal quotation marks and citation omitted). "Probable cause is a fluid concept that focuses on 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" United States v. Colbert, 605 F.3d 573, 576 (8th Cir. 2010) (quoting Illinois v. Gates, 462 U.S. 213, 231 (1983)). Courts use a "totality of the circumstances test . . . to determine whether probable cause exists." United States v. Hager, 710 F.3d 830, 836 (8th Cir. 2013) (citation omitted).

The sufficiency of a search warrant affidavit is examined using "common sense and not a hypertechnical approach." United States v. Grant, 490 F.3d 627, 632 (8th Cir. 2007) (citation and internal quotations omitted). "In ruling on a motion to suppress, probable cause is determined based on 'the information before the issuing judicial officer.'" United States v. Smith, 581 F.3d 692, 694 (8th Cir. 2009) (quoting United States v. Reivich, 793 F.2d 957, 959 (8th Cir. 1986)). "Therefore, '[w]hen the [issuing judge] relied solely upon the supporting affidavit to issue the warrant, only that information which is found in the four corners of the affidavit may be considered in determining the existence of probable cause.'" United States v. Wiley, No. 9–cr–239 (JRT/FLN), 2009 WL 5033956, at *2 (D. Minn. Dec. 15, 2009) (Tunheim, J.) (quoting United States v. Solomon, 432 F.3d 824, 827 (8th Cir. 2005)) (alterations in Wiley). In addition, the issuing court's "determination of probable cause should be paid great deference by reviewing courts." Gates, 462 U.S. at 236 (quoting Spinelli v. United States, 393 U.S. 410, 419 (1969)). "[T]he duty of a reviewing court is simply to ensure that the [issuing court] had a 'substantial basis for . . . conclud[ing]' that probable cause existed." Id. at 238–39 (quoting Jones v. United States, 362 U.S. 257, 271 (1960)).

**B. July 26, 2016, Location Monitoring Search Warrant**

Defendant seeks an Order of this Court suppressing all evidence flowing from the July 26, 2016, "Findings, Order, and Tracking Warrant" which Defendant mischaracterizes as the "warrantless GPS and cell tower tracking of Defendant's mobile phone." (Def.'s Mem., [Docket No. 31], at 1).

Defendant concedes there was a "state court order purportedly requiring the phone service provider to provide historical and real time location data to the agents so they could conduct the tracking of the mobile telephone"; however, Defendant asserts the "state court order"

was not a warrant. (Id. at 1–5). Instead, Defendant contends that the July 26, 2016, document in the present case was the same type discussed in Carpenter v. United States, 138 S.Ct. 2206 (2018), and for the same reasons discussed in that case, the "information" in the present case, obtained pursuant to the July 26, 2016, "document," was obtained "in violation of the Fourth Amendment because of the lack of a valid warrant or an applicable exception to the warrant requirement." (Def.'s Mem., [Docket No. 31], at 2). The Court finds Defendant's reliance on Carpenter to be misplaced under the circumstances of the present case.

In Carpenter, the Supreme Court held that a person has a legitimate expectation of privacy in regard to his historical cell site location information, that review of the historical cell site location information by law enforcement constitutes a search under the Fourth Amendment, and that the government must obtain a search warrant based on probable cause before it can permissibly acquire historical cell site location information. Carpenter, 138 S.Ct. 2206. Before Carpenter, Courts had held that for an Order authorizing the acquisition of historical cell site location information to be issued, the Stored Communications Act required only an application containing a certification that the information to be gained through the cell site historical location data was relevant and material to an ongoing investigation. See, Id. Such applications were not typically accompanied by any sworn affidavits. See, Id. The Carpenter Court found such minimal applications to be insufficient under the Fourth Amendment because they lacked a showing of probable cause or even a requirement that probable cause be demonstrated. See, Id.

The July 26, 2016, application, affidavit, and "Findings, Order, and Tracking Warrant" now at issue are, however, far more extensive than the mere application and certification of relevance at issue in Carpenter. In the present case, the "Findings, Order, and Tracking Warrant" was issued by a neutral and detached judicial officer who found that probable case existed based

on the sworn affidavit submitted in support of said warrant. Defendant's reliance here on Carpenter, where no such sworn attestation was made nor a judicial finding of probable cause was ever issued, is misplaced.

In the present case, SA Fraik's sworn affidavit in support of the application for a "Tracking Warrant" contained information that there was an outstanding federal arrest warrant for Defendant; the subject telephone number was Defendant's last known phone number as provided by the probation officer assigned to Defendant's case; that said probation officer had communicated with Defendant using that very telephone number a mere seven days prior to SA Fraik's application for a warrant; that the cell site location information would provide information as to Defendant's whereabouts; and that said information would aid law enforcement in executing an outstanding felony warrant and lead to the arrest of Defendant. Based on the foregoing, the judicial officer had a substantial basis to conclude that probable cause existed to support the "Tracking Warrant." The issuing judicial officer had been provided information that there was an active federal warrant commanding law enforcement to arrest Defendant, and the information learned through the "Tracking Warrant" was likely to provide law enforcement with Defendant's location for use in executing the federal warrant.

Therefore, to the extent Defendant's Motion to Suppress Evidence seeks an Order of this Court suppressing all evidence ostensibly as fruit of the poison tree flowing from the July 26, 2016, "Findings, Order, and Tracking Warrant," the undersigned recommends that Defendant's Motion to Suppress, [Docket No. 25], be **DENIED**.

### C.  July 27, 2016, Roadside Search of the Chrysler 300 During Traffic Stop

Defendant next moves this Court for an Order suppressing all evidence obtained during the roadside search of the Chrysler 300 during the traffic stop on July 27, 2016. (Def.'s Mem., [Docket No. 22], at 5–6).

In support of this request, Defendant argues that the "purported justification for the traffic stop . . . fails." (Id. at 5).[10] In support of this argument, Defendant asserts that "[t]he only basis for the traffic stop asserted by" Trooper Otterson "was his claimed observation of the purported 'illegal tint' of the windows" but in the "squad video . . . the windows are clearly visible, and the observer has no trouble clearly seeing through them." (Id.). Defendant further asserts that Trooper Otterson's "further testimony that he issued a warning ticket to the driver for having the tinted windows . . . is belied by the video" because in the video Trooper Otterson provides the driver with a ticket for driving after suspension and "[n]o mention is made of tinted windows." (Id. at 6). The Court finds each of these arguments to be unpersuasive.

First, the Court notes that Defendant's assertions are, at least in part, factually inaccurate. Defendant asserts that the copy of the video depicting the July 27, 2016, traffic stop contains "no mention" of the tinted windows. However, the Court's own review of the video finds that Trooper Otterson mentions and references the tint of the windows several times during the encounter. In fact, Trooper Otterson begins his entire encounter with the vehicle occupants by informing the vehicle occupants that he initiated the traffic stop because of the tint of the windows which he believed to be outside the legal limit. Moreover, near the end of the video of

---

[10] Defendant also contends that "[b]ecause the location data is itself the fruit of the poisonous tree, so too is the stop and search of the vehicle and the seizure of its occupants." (Id. at 5). However, the Court has already determined that the judicial officer who issued the Tracking Warrant had a substantial basis to believe that it was supported by probable cause, and therefore, Defendant's fruit of the poisonous tree argument here fails.

the encounter, Trooper Otterson tests the tint of the windows, and he finds it to be outside of the legal limits.

Second, despite Defendant's conclusory assertion to the contrary, Trooper Otterson's justification for the traffic stop does not "fail." In the State of Minnesota, where the traffic stop now at issue took place, a person may "not drive or operate any motor vehicle . . . when any side window or rear window . . . has a light transmittance of less than 50 percent plus or minus three percent in the visible light range." Minn. Stat. 169.71, subd. 4. Courts have routinely held that such a suspected offence is an independent traffic violation that will justify initiating a traffic stop. See, e.g., United States v. Travis, No. 14-cr-253 (DSD/SER), 2015 WL 439393, at *1, 11 (D. Minn. Feb. 3, 2015); United States v. Maurstad, No. 18-cr-300 (1) (SRN/KMM), 2019 WL 4863451, at *3 (D. Minn. Aug. 21, 2019), report and recommendation adopted, 2019 WL 4862029 (D. Minn. Oct. 2, 2019).

"The Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." United States v. Jones, 269 F.3d 919, 924 (8th Cir. 2001) (quoting U.S. Const. amend. IV). Roadside traffic stops constitute seizures for the purposes of the Fourth Amendment. See, e.g., Delaware v. Prouse, 440 U.S. 648, 653 (1979). To be lawful, a traffic stop must be supported at least by a reasonable, articulable suspicion that a crime is being committed. Jones, 269 F.3d at 924 (citing Prouse, 440 U.S. at 663). The Eighth Circuit Court of Appeals has repeatedly held that any traffic violation, no matter how minor, will provide at least a reasonable, articulable basis to justify a traffic stop. See, e.g., United States v. Houston, 548 F.3d 1151, 1153 (8th Cir. 2008).

Once a stop has been lawfully initiated, the officer is entitled to conduct an investigation, the scope of which must be reasonably related to the circumstance which give rise to the stop. Rodriguez v. United States, 575 U.S. 348, 353 (2015). A court reviewing the validity of an initial stop examines whether an officer's actions were objectively reasonable under the circumstances known to the officer at the time. United States v. Smart, 393 F.3d 767, 770 (8th Cir. 2005).

Defendant again argues that the Chrysler 300 was not initially stopped for a valid traffic law violation on July 27, 2016, because, according to Defendant, the video of said stop shows that an observer can "clearly" see through the window.

A traffic stop generally must be supported by at least reasonable, articulable suspicion that criminal activity has occurred or is taking place. United States v. Martin, 411 F.3d 993, 1000 (8th Cir. 2005). As noted above, a traffic violation, however minor, is sufficient to justify an initial stop of a vehicle. Martin, 411 F.3d at 1000. "This is true even if a valid traffic stop is a pretext for another investigation." United States v. Linkous, 285 F.3d 716, 719 (8th Cir. 2002).

At the February 10, 2020, Motions Hearing, Trooper Otterson testified that he initiated the July 27, 2016, traffic stop because upon observing the Chrysler 300 he formed the belief that the window tint on the Chrysler 300 was in violation of Minnesota law. The credibility of Trooper Otterson's belief is bolstered by the fact that the actual test of window tint of the Chrysler 300 demonstrated that the tint was outside of the spectrum permitted by law in Minnesota. The Court finds credible Trooper Otterson's testimony that he initially believed the window tint on the Chrysler 300 was darker than allowed by law in Minnesota. Therefore, on the record now before the Court, Trooper Otterson possessed a reasonable, articulable basis to conduct the initial July 27, 2016, traffic stop of the Chrysler 300.

Moreover, even assuming solely for the sake of argument that Trooper Otterson's belief regarding the level of the window tint had been mistaken, the Court would find that mistaken belief to be reasonable. Therefore, a reasonable, articulable basis would still exist to conduct the July 27, 2016, traffic stop of the Chrysler 300. Other Courts, including within this District, have found that an officer's mistaken belief that a window tint was too dark is a reasonable mistake. See, e.g., United States v. Travis, No. 14-cr-253 (DSD/SER), 2015 WL 439393, at *11 (D. Minn. Feb. 3, 2015); United States v. Dominguez, No. 18-cr-21, 2018 WL 4762897, at *3–4 (S.D.Ga Sept. 14, 2018), report and recommendation adopted, 2018 WL 4762126 (S.D.Ga. Oct. 2, 2018); United States v. Ushery, 526 F. Supp. 2d 497, 501 (M.D. Penn. 2007); see also, United States v. Sanders, 196 F.3d 910, 913 (8th Cir. 1999).

Thus, the Court concludes that Trooper Otterson had a reasonable, articulable basis to initiate the July 27, 2016, traffic stop, and the July 27, 2016, traffic stop was therefore constitutionally permissible. Defendant does not argue that the traffic stop was unreasonably expanded or that the stop was impermissibly long in duration. Based on the record now before the Court, the undersigned finds that the July 27, 2016, initial traffic stop itself passes constitutional muster.[11]

The Court must still consider the constitutional permissibility of the roadside search of the Chrysler 300 conducted during the July 27, 2016, traffic stop.

---

[11] The Court further notes that Trooper Otterson had a reasonable, articulable basis to initiate a traffic stop of the Chrysler 300 because other law enforcement officers had informed Trooper Otterson that information obtain from the "Tracking Warrant" placed Defendant's cellular telephone in the same location as the Chrysler 300 throughout the day, and there was an outstanding federal warrant commanding Defendant's arrest. Therefore, Trooper Otterson was "well within constitutional limits" in conducting the July 27, 2020, traffic stop of the Chrysler 300. United States v. Vang, No. 17-cr-104 (RHK/FLN), 2017 WL 9274908, at *3 (D. Minn. July 25, 2017), report and recommendation adopted, 2017 WL 4286207 (D. Minn. Sept. 27, 2017) (quoting United States v. Patrick, 776 F.3d 951, 953 (8th Cir. 2015)); see, United States v. Hensley, 469 U.S. 221, 232 (1985); United States v. Polar, No. 4-cr-223 (JRT/RLE), 2004 WL 2980215, at *4 (D. Minn. Dec. 15, 2004).

"The Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." United States v. Jones, 269 F.3d 919, 924 (8th Cir. 2001) (quoting U.S. Const. amend. IV). "[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically and well-delineated exceptions." United States v. Davis, 569 F.3d 813, 816 (8th Cir. 2009) (citing Katz v. Unites States, 389 U.S. 347, 357 (1967)). One of these exceptions is the "automobile exception." United States v. Williams, 616 F.3d 760, 764 (8th Cir. 2012).

"[T]he 'automobile exception' permits the warrantless search of a vehicle if the police 'had probable cause to believe the vehicle contained contraband or other evidence of a crime before the search began.'" United States v. Vore, 743 F.3d 1175, 1179 (8th Cir. 2014) (quoting United States v. Wells, 347 F.3d 280, 287 (8th Cir. 2003)). "Probable cause sufficient to justify a search exists where, in the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular place." United States v. Kennedy, 427 F.3d 1136, 1141 (8th Cir. 2005). In making the probable cause determination, Courts "apply a common sense approach and consider all relevant circumstances." Id. "[P]robable cause may be based on the collective knowledge of all law enforcement officers involved in an investigation and need not be based solely upon the information within the knowledge of the officer on the scene if there is some degree of communication." United States v. Wells, 347 F.3d 280, 287 (8th Cir. 2003).

In the present case, Trooper Otterson initiated a constitutionally permissible traffic stop of the Chrysler 300 on July 27, 2016. As detailed above, during that traffic stop Trooper Otterson's K-9 partner Busa "alerted" twice while Trooper Otterson led Busa around the exterior

of the Chrysler 300. It is well established that a properly trained police dog's positive alert while sniffing the exterior of a vehicle provides a law enforcement officer with the probable cause necessary to search the vehicle without a warrant pursuant to the automobile exception. See, e.g., United States v. Holleman, 743 F.3d 1152, 1158 (8th Cir. 2014); United States v. Donnelly, 475 F.3d 946, 955 (8th Cir. 2007); United States v. Sanchez, 417 F.3d 971, 976 (8th Cir. 2005); United States v. Bloomfield, 40 F.3d 910, 919 (8th Cir. 1994); United States v. Linkous, 285 F.3d 716, 721 (8th Cir. 2002); United States v. Hill, 386 F.3d 855, 858 (8th Cir. 2004); United States v. Claude X, 648 F.3d 599, 602 (8th Cir. 2011). Therefore, the limited search of the readily accessible portions of the passenger compartment, glove box, and trunk of the Chrysler 300 during the July 27, 2016, traffic stop was constitutionally permissible under the automobile exception.

Therefore, to the extent Defendant's Motion to Suppress Evidence seeks an Order of this Court suppressing all evidence located during and subsequently flowing from the July 26, 2016, traffic stop, the undersigned recommends that Defendant's Motion to Suppress, [Docket No. 25], be **DENIED**.

### D.  July 30, 2016, Search of the Chrysler 300 Pursuant to Warrant

Defendant next seeks an Order of this Court suppressing all evidence seized during the July 30, 2016, search of the Chrysler 300 by Trooper Otterson and his K-9 partner Busa. Defendant asserts that said evidence should be suppressed because "[t]he affidavit . . . [submitted in support of the application for a warrant] is insufficient to support a finding of probable cause." (Def.'s Mem., [Docket No. 31], at 7). Specifically, Defendant asserts that the affidavit submitted in support of the application for a warrant is insufficient because it lacks sufficient information regarding the "Confidential Reliable Informant" who provided some of the information noted in

the affidavit and because Trooper Otterson failed to disclose that he had already searched the vehicle roadside during the July 27, 2016, initial traffic stop. (Id. at 6–10).

In the alternative, Defendant "requests a hearing, pursuant to Franks v. Delaware, 438 U.S. 154 (1978), based on the deliberate and reckless omission in the affidavit of Trooper Otterson that was submitted in support of the warrant." (Def.'s Mem., [Docket No. 31], at 6). Defendant makes his request for a Franks hearing based on his assertion that Trooper Otterson's affidavit "makes no mention" that law enforcement had already searched the Chrysler 300 roadside during the July 27, 2020, traffic stop; fails to provide any reasons to believe that "anything further would be found in the vehicle"; and fails to provide that the "request for the search warrant for the second search was based on nothing more than a hunch." (Def.'s Mem. [Docket No. 31]).

Defendant challenges the July 30, 2016, search of the Chrysler 300 which occurred while it was impounded in the secured garage at Trooper Otterson's office three days after the July 27, 2016, initial traffic stop of the Chrysler 300. Defendant contends that evidence obtained in this second search must be suppressed because Trooper Otterson's affidavit submitted in support of the warrant to search the Chrysler 300 lacks a showing of probable cause. Defendant contends that any information obtained as a result of the July 27, 2016, roadside search included in the subsequent warrant application is tainted and when properly excised, the warrant for the July 30, 2016, search of the Chrysler 300 lacks probable cause.

However, the Court has already determined that Trooper Otterson permissibly searched the Chrysler 300 roadside on July 27, 2016, pursuant to the automobile exception, and therefore, Trooper Otterson was not required to obtain a subsequent search warrant at that time to search the Chrysler 300. See, e.g., United States v. Holleman, 743 F.3d 1152, 1158 (8th Cir. 2014).

Because the Court has determined that the July 27, 2016, roadside search was permissible under the automobile exception, the Court need not examine or review the search warrant for the July 30, 2016, search nor address Defendant's arguments directed at that search warrant because the search warrant was superfluous. See, e.g., Id.; United States v. Brown, No. 9-cr-145(JNE/RLE), 2009 WL 2982934, at *12 n. 22 (D. Minn. Sept. 14, 2009), aff'd, 653 F.3d 656 (8th Cir. 2011).

Trooper Otterson was constitutionally permitted to search the Chrysler 300 on July 30, 2016, pursuant to the automobile exception even though the July 30, 2016, search occurred three days after the July 27, 2016, initial traffic stop. See, e.g., Brown, 2009 WL 2982934, at *12 n. 22 (involving a search of a vehicle that occurred three days after a traffic stop and declining to consider the merits of a search warrant to search the vehicle after concluding that the initial search, three days prior, was proper under the automobile exception); United States v. Rodriguez, 414 F.3d 837, 844 (8th Cir. 2005) ("[P]robable cause existed to search the entire vehicle, and a search pursuant to the automobile exception to the Fourth Amendment may take place at a separate place and time.") (citing United States v. Winters, 221 F.3d 1039, 1041 (8th Cir. 2000)); United States v. Polar, No. 4-cr-223 (JRT/RLE), 2004 WL 2980215, at *6 (D. Minn. Dec. 15, 2004); see also, United States v. Johns, 469 U.S. 478, 484 (1985) (upholding warrantless search of packages that occurred three days after the officers transported the trucks to the Drug Enforcement Administration headquarters and noting that "[a] vehicle in police custody may be searched on the basis of probable cause to believe that it contains contraband," and "[t]he justification to conduct such a warrantless search does not vanish once the car has been immobilized" or taken into police custody).

Therefore, to the extent Defendant's Motion to Suppress Evidence seeks an Order of this Court suppressing all evidence located during and thereafter flowing from the July 30, 2016,

search of the Chrysler 300 while it was in impound, the undersigned recommends that

Defendant's Motion to Suppress, [Docket No. 25], be **DENIED**.[12]

### E.  August 5, 2016, Search of Two Cellular Telephones Pursuant to Warrant

Defendant also seeks an Order of this Court suppressing all evidence obtained in the

August 5, 2016, search of the two cellular telephones. (Def.'s Mem., [Docket No. 31], at 10–11).

Defendant acknowledges that the August 5, 2016, search of the two cellular telephones was

conducted pursuant to a state court search warrant obtained by SA Fraik. (Id.). "Defendant

contests this search solely for the reasons that the entire factual basis for probable cause

submitted in the affidavit in support of the warrant was derived from previous searches and

seizures that were constitutionally infirm." (Id.). Defendant, therefore, argues that the August 3,

2016, search warrant secured to conduct the August 5, 2016, search of the cellular telephones is

the "fruit of the poisonous tree," and it must be suppressed. (Id.).

"Under the fruit of the poisonous tree doctrine, the exclusionary rule bars the admission

of physical evidence and live witness testimony obtained directly or indirectly through the

exploitation of police illegality." United States v. Simpson, 439 F.3d 490, 493–94 (8th Cir. 2006)

(internal quotations omitted) (quoting Hamilton v. Nix, 809 F.2d 763, 765 (8th Cir. 1987)). In

the present case, however, the Court has found constitutionally permissible all of the "searches

and seizures" at issue prior to the date SA Fraik drafted his affidavit in support of his application

for the telephone content search warrant. Therefore, no taint was created when the underlying

---

[12] Furthermore, to the extent Defendant's Motion to Suppress Evidence seeks an Order of this Court convening a hearing pursuant to Franks v. Delaware, 438 U.S. 154 (1978), the undersigned still recommends that Defendant's Motion to Suppress, [Docket No. 25], be **DENIED**. "A defendant may obtain a Franks hearing if (1) he makes a 'substantial preliminary showing' that the affiant intentionally or recklessly included a false statement in the warrant affidavit, and (2) the false statement was 'necessary to the finding of probable cause.'" United States v. Shockley, 816 F.3d 1058, 1061 (2016) (citations omitted). In the present case, such a showing is impossible as the Court has now concluded that the July 30, 2016, search warrant was constitutionally superfluous because the July 30, 2016, search of the Chrysler 300 was constitutionally permissible pursuant to the automobile exception.

evidence was used in SA Fraik's application for a search warrant to search the two cellular telephones.

Defendant fails to offer any other basis other than his "fruit of the poison tree" argument as to why evidence obtained through the execution of the August 3, 2016, search warrant should be suppressed. Defendant does not allege that the August 3, 2016, search warrant, as drafted, lacked probable cause.

Therefore, to the extent Defendant's Motion to Suppress Evidence seeks an Order of this Court suppressing all evidence flowing from the August 5, 2016, search of the two cellular telephones, the undersigned recommends that Defendant's Motion to Suppress, [Docket No. 25], be **DENIED**.

### F.  June 27, 2019, Execution of then Red Lake Tribal Search Warrant

Lastly, Defendant takes issue with "the search and seizure of Defendant's person and vehicle on 27 June 2019." (Def.'s Mem., [Docket No. 31], at 11–13). The "search and seizure of Defendant's person and vehicle on 27 June 2019" took place while Red Lake Tribal Police Officers executed a search of the "Gitch" residence pursuant to a June 27, 2019, Red Lake Tribal Court Search Warrant.[13] However, the exact parameters of Defendant's challenge and the relief sought by said challenge are unclear. (See, Def.'s Mem., [Docket No. 31], at 11–13).

Defendant does <u>not</u> specifically ask that any evidence itself be suppressed or specifically ask for any relief relative to the June 27, 2019, search. Defendant leaves the Court to determine the relief sought. Further confusing the issue, Defendant fails to specify the vehicle to which he

---

[13] As previously noted, the Government's Exhibit 6 is the Red Lake warrant application, supporting affidavit, and Red Lake Tribal Search Warrant now at issue. At the Motions Hearing, the Government offered the warrant application, supporting affidavit, and Red Lake Tribal Court Search Warrant now at issue into evidence as Government's Exhibit 6. (February 10, 2020, Motions Hearing, Digital Recording at 2:17–2:23 p.m.). Defendant objected Government's Exhibit 6 on the basis of a purported lack of foundation. (<u>Id.</u>). The Court provisionally admitted Government's Exhibit 6. (<u>Id.</u>).

refers when he references his "vehicle," and the record provides no indication as to the vehicle to which he is referring. The issue is further muddle by the fact that Defendant asserts that he takes issue with "the search and seizure of [his] person and vehicle on 27 June 2019"; but the majority of his argument addresses the validity of the Red Lake Tribal Court Search Warrant which authorized the search of the described "Gitch" residence, the described vehicle at said residence, and the two non-defendant persons identified in the search warrant. (See, Id.).

Defendant appears to base his present challenge and apparent request for relief on his assertion that the Red Lake Tribal Court Search Warrant itself "should not be admitted here because" the Government "has failed to prove its authenticity and it is facially invalid." (Def.'s Mem., [Docket No. 31], at 11–13). In the alternative, Defendant argues that even if the Court were to admit the Red Lake Tribal Court Search Warrant as a "valid warrant," that Warrant "only authorized the search of a named house and vehicle, and the search and seizure of two named persons—but *not* Defendant Fisher." (Id. at 13) (emphasis in original).

Regarding the validity, authenticity, and foundation of the Red Lake Tribal Court Search Warrant, Defendant argues that it should not be admitted into evidence because the Government has failed to establish a sufficient foundation to show that it is actually a search warrant issued by the Red Lake Tribal Courts; the document is not self-authenticating under Federal Rule of Evidence 902; no evidence was offered to authenticate the document under Rule 901; and "errors" within the document "simply would not appear in an authentic, real warrant." (Def.'s Mem., [Docket No. 31], at 11–13). Defendant also asserts that it is "apparent" the judicial officer who signed the "warrant did not even bother to read the affidavit . . . ." (Id. at 12). Therefore, according to Defendant, the Court should not admit the Red Lake Tribal Court Search Warrant itself into evidence. Defendant's arguments are unpersuasive.

28

First, the Federal Rules of Evidence do not apply to pretrial suppression proceedings, such as the current proceedings. See, e.g., United States v. Golden, 418 F. Supp. 3d 416, 422 (D. Minn. 2019); United States v. Boyce, 797 F.2d 691, 693 (8th Cir. 1986); United States v. Stepp, 680 F.3d 651, 668 (6th Cir. 2012); United States v. Kellogg, 202 F. App'x 96, 102 (6th Cir. 2006); United States v. Schaefer, 87 F.3d 562, 570 (1st Cir. 1996) ("Thus, apart from questions of privilege, the Federal Rules of Evidence do not apply at suppressions hearings."); United States v. Raddatz, 447 U.S. 667, 679 (1980) ("At a suppression hearing, the court may rely on hearsay and other evidence, even though that evidence would not be admissible at trial."); Fed. R. Evid. 104(a). Thus, Defendant's argument based on the Federal Rules of Evidence lend no support to Defendant's objection to the Red Lake Tribal Court Search Warrant.

Although the Federal Rules of Evidence do not apply to suppression proceedings, "[t]he evidence upon which the Court relies in ruling on a suppression motion must still be sufficiently reliable and probative." United States v. Golden, 418 F. Supp. 3d 416, 422 (D. Minn. 2019) (collecting cases). However, if we do consider for the sake of argument the Federal Rules of Evidence in the present consideration as suggested by Defendant, the Eighth Circuit Court of Appeals, relying on the Federal Rules of Evidence in the civil context, has previously provided that a "warrant" signed by a judge is a "self-authenticating" document. See, gen., in accord, Moore v. City of Desloge, Mo., 647 F.3d 841, 848 (8th Cir. 2011); Fed. R. Evid. 902. In the present case, the Red Lake Tribal Court Search Warrant was signed by a Tribal Judge, and on its face, it provides that it is a warrant publicly filed in Tribal Court. Moreover, Courts in this District, including this Court, routinely admit Tribal Court Warrants materially and substantial similar to the June 27, 2019, Red Lake Tribal Court Search Warrant now at issue, including Warrants issued by Judges of the Red Lake Tribal Court. See, e.g., United States v. Jones, No.

16-cr-170 (MJD/LIB), 2016 WL 7368200, at *7–9 (D. Minn. Oct. 3, 2016) (discussing the acceptance of search warrants issued by a Red Lake Tribal Judge and the authority of Tribal Judges to issue such warrants), report and recommendation adopted, 2016 WL 7366081 (D. Minn. Dec. 19, 2016).

Defendant's assertions in support of his contention that the Red Lake Tribal Court Search Warrant for the "Gitch" residence should itself not be admitted into evidence also focuses on perceived errors in the text of the warrant and mischaracterizations of that text. For example, Defendant asserts that "the signature of the alleged judge on the warrant is not a signature authorizing the warrant, but rather a signature that is '[s]ubscribed and sworn to before me,' indicating that the so-called judge was simply an affiant swearing out the findings set forth in the boilerplate language above." (Def.'s Mem., [Docket No. 31], at 12). Although Defendant's assertion that the Tribal Judge signed the warrant application noting that Red Lake Criminal Investigator Leyba had sworn to the contents of the affidavit is true, Defendant's assertion ignores the fact that the Tribal Judge also signed the last page of the warrant itself. It is the Tribal Judge's signature on the last page of the Tribal Court Search Warrant itself which authorizes the search of the "Gitch" residence.

Similarly, Defendant asserts that "the purported 'warrant' authorizes a search for 'heroin' when the application for the warrant instead sought authority specifically to search for methamphetamine." (Id. at 12). Here again, Defendant's assertion is not a proper reflection of the record now before the Court. CI Leyba's application for a search warrant did reference methamphetamine, however, it sought to search for "[a]ny and all controlled substances, including but not limited to methamphetamine." (Gov't's Ex. 6 at 1). The Red Lake Tribal Court Search Warrant authorized a search for "[a]ny and all controlled substances, including but not

30

limited to heroin." (<u>Id.</u> at 5). Although the two phrases are not identical, they are not inherently contradictory of one another, and more importantly, the slight difference between the two phrases does nothing to discount the self-authenticating validity of the search warrant itself. Moreover, CI Leyba's affidavit submitted in support of the application for the search warrant specifically notes that law enforcement had been informed of the sale of methamphetamine <u>and</u> heroin at the subject residence. (<u>Id.</u> at 3).

Defendant also point to a perceived typographical error in the Red Lake Tribal Court Warrant. In the last sentence of the Red Lake Tribal Search Warrant, it reads that law enforcement officers "ARE HEREBY COMMANDED <u>A ANYTIME SEARCH</u> TO SEARCH THE DESCRIBED PREMISES, THE PERSON OF [sic], FOR THE ABOVE-DESCRIBED PROPERTY AND THINGS . . . ." (<u>Id.</u> at 6) (capitalization in original) (underlining added). Defendant takes umbrage over the underlined portion of the previous quotation. The insertion of the phrase, "a [sic] anytime search" appears to have occurred because CI Leyba's application requested a warrant for "a anytime search," and that language was inserted into the final sentence of the search warrant. (<u>See</u>, <u>Id.</u>). Here again, however, the typographical error, to the extent it was unintended by the Tribal Judge, does nothing to discount the self-authenticating validity of the Red Lake Tribal Court Search Warrant itself.

Defendant also asserts that the Red Lake Tribal Search Warrant fails to identify the persons who are to conduct or execute the search. This is another factual inaccuracy. The Red Lake Tribal Court Search Warrant specifically identifies CI Leyba as the affiant, and it provides that the search warrant is to be executed by him and other personnel under his direction and control. (Gov't Ex. 6 at 5, 6).

For the reasons discussed herein, the Court finds the Red Lake Tribal Court Search Warrant submitted as Government's Exhibit 6 to be valid and authentic. Therefore, it is recommended that Government's Exhibit 6 itself not be suppressed.[14]

Defendant does not separately argue that the June 27, 2019, affidavit in support of the application for a search warrant for the "Gitch" residence fails to establish probable cause to support the issuance of the June 27, 2019, Red Lake Tribal Court Search Warrant. The Court's review of CI Leyba's affidavit finds that it provided the Red Lake Tribal Judge with a sufficient basis for concluding that probable cause existed to issue the June 27, 2019, Red Lake Tribal Court Search Warrant.

Defendant conclusory argues that even if the Red Lake Tribal Search Warrant is itself admitted into evidence as a valid warrant, the Red Lake Tribal Court Search Warrant did not authorize his arrest, his detention, or the search of his person. The Court finds this assertion to be irrelevant to the present consideration. There is no indication or assertion on the record now before the Court that law enforcement arrested or searched Defendant pursuant to the June 27, 2019, Red Lake Tribal Court Search Warrant itself. Rather, it appears that Defendant was present at the "Gitch" residence and that he was arrested as a result of the narcotics and contraband found when the June 27, 2019, Red Lake Tribal Court Search Warrant was executed.

Therefore, to the extent Defendant's Motion to Suppress Evidence seeks an Order of this Court suppressing the June 27, 2019, Red Lake Tribal Court Search Warrant itself, Government

---

[14] The Court notes that in his memorandum and throughout his discussion of the Red Lake Tribal Search Warrant, Defendant makes several refences ostensibly disparaging the authority of the Tribal Judge without actually arguing that the Tribal Judge lacked authority to issue the search warrant. (See, Def.'s Mem., [Docket No. 31], at 11–13) (referring to the issuing Tribal Judge in quotations as the "judge" and the "alleged judge" and the "so-called judge"). As this Court has previously explained, Tribal Judges of the Red Lake Tribal Court are proper judicial officers of the Red Lake Tribe's sovereign Court. See, United States v. Jones, No. 16-cr-170 (MJD/LIB), 2016 WL 7368200, at *7–9 (D. Minn. Oct. 3, 2016), report and recommendation adopted, 2016 WL 7366081 (D. Minn. Dec. 19, 2016). To the extent Defendant argues the Red Lake Tribal Judge lacked the authority to issue a search warrant authorizing the search of premises within the boundaries of the Red Lake Reservation, such as the June 27, 2019, Red Lake Tribal Court Search Warrant now at issue, Defendant's argument is rejected.

Exhibit 6, the undersigned recommends that Defendant's Motion to Suppress, [Docket No. 25], be **DENIED**.

## IV.    Conclusion

Therefore, based on the foregoing and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED THAT**:

1. Defendant's Motion to Dismiss, [Docket No. 22], be **DENIED**; and

2. Defendant's Motion to Suppress Evidence, [Docket No. 25], be **DENIED.**

Dated: July 7, 2020                                s/Leo I. Brisbois
                                                   Hon. Leo I. Brisbois
                                                   U.S. MAGISTRATE JUDGE

### N O T I C E

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "A party may file and serve specific written objections to a magistrate judge's proposed findings and recommendation within 14 days after being served with a copy of the recommended disposition[.]" A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.