# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Case No. 19-cr-320 (SRN/LIB) |
| Plaintiff, | |
| v. | **ORDER** |
| Wayne Michael Fisher, | |
| Defendant. | |

Andrew R. Winter, United States Attorney's Office, 300 S. 4th St., Ste. 600, Minneapolis, MN 55415, for the Government.

Daniel L Gerdts, 331 Second Avenue South, Ste. 705, Minneapolis, MN 55401, for Defendant.

SUSAN RICHARD NELSON, United States District Judge

Before the Court are Defendant Wayne Michael Fisher's Objections ("Objections") [Doc. No. 38] to the July 7, 2020 Report and Recommendation (R&R") [Doc. No. 37] filed by Magistrate Judge Leo I. Brisbois. The R&R addresses Mr. Fisher's motion to dismiss Count III of the Indictment [Doc. No. 22] and his pretrial motion to suppress evidence [Doc. No. 25] obtained from certain searches of two vehicles and a residence. The magistrate judge held an evidentiary hearing on these motions on February 10, 2020. (*See* Minute Entry [Doc. No. 27].) In the R&R, Magistrate Judge Brisbois ("Judge Brisbois") recommends that both motions be denied in their entirety.

Mr. Fisher filed timely objections to the R&R, ([Doc. No. 38]), to which the

Government responded [Doc. No. 39].  Pursuant to federal law, the Federal Rules of Civil Procedure, and local rules, the Court must perform a *de novo* review of any portion of the magistrate judge's opinion to which objections are made.  28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b)(3); D. Minn. L.R. 72.2(b)(3).  Based on that *de novo* review, Mr. Fisher's Objections are overruled, the R&R is adopted in full, and both motions are denied.

## I.      BACKGROUND

### A.      Factual Background

The factual background of this case is set forth in the R&R, which the Court incorporates herein by reference.  Stated briefly, Mr. Fisher is charged by way of indictment with one count of conspiracy to distribute methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846, and two counts of possession with intent to distribute a controlled substance, in violation of 21 U.S.C. § 841(a)(1), 21 U.S.C. § 841(b)(1)(A) and 18 U.S.C. § 2.  (Indictment [Doc. No. 1].)  As set forth in the R&R, the charges stem from (1) a federal arrest warrant and a warrant to track Mr. Fisher's cellular phone movements, resulting in a traffic stop occurring on July 27, 2016, and a second search of the same vehicle occurring on July 30, 2016, (2) a search warrant executed on the contents of two cellular telephones seized during the July 27, 2016 traffic stop, and (3) a search warrant executed of a residence and separate vehicle on June 27, 2019.  (R&R at 1-12.)

### 1.      Federal Arrest Warrant and Tracking Warrant

On July 26, 2016, this Court issued a warrant for Mr. Fisher's arrest for violation of the terms of his supervised release.  (*Id*. at 2)(citing Gov't's Ex. 2).)  After the issuance of this arrest warrant, Special Agent Robert Fraik ("Special Agent Fraik") of the Minnesota

Bureau of Criminal Apprehension, obtained a warrant to track Mr. Fisher's cellular phone movements.  (*Id*.) (citing Gov't's Ex. 3 ("tracking warrant")).)  In his supporting affidavit for the tracking warrant, Special Agent Fraik stated that the warrant was required to aid in conducting a criminal investigation of Mr. Fisher "in connection with possible violations of state and federal law relative to an outstanding arrest warrant for a supervised release violation."  (*Id*. at 2-3.)

As Judge Brisbois noted, "[a]ccording to the materials submitted in support of the issuance of the tracking warrant, it was believed that subjects of the investigation were using the subject telephone number in furtherance of those violations, and therefore, the information obtained through the requested tracking warrant would be relevant to the investigation."  (*Id*. at 3.)  Specifically, in Special Agent Fraik's "Statement of Probable Cause," he specified that Mr. Fisher had an "outstanding felony level arrest warrant" and "there was reason to believe that probable cause exist[ed] that the person who possess[ed]" the subject "electronic device [was] committing, ha[d] committed, or [was] about to commit a crime." (*Id*.)  He further attested that locating the telephone using the subject phone number would "likely provide fruitful information as to the whereabouts of" Mr. Fisher and "aid law enforcement in locating and arresting" Mr. Fisher "for a felony level arrest warrant."  (*Id*.)

After Special Agent Fraik swore under oath to the statements made in his application, a Beltrami County District Court Judge issued the tracking warrant on July 26, 2016.  The issuing judge determined that there was "reason to believe that . . . probable cause exist[ed] that a crime has been, or [was] about to be committed by a person in

possession of an electronic device" subject to the warrant.  (*Id*. at 3-4.)

### 2.      July 27, 2016 Traffic Stop

On July 27, 2016, Minnesota State Highway Patrol Trooper Nicholas Otterson ("Trooper Otterson")[1] received several phone calls from Special Agent Robert Fraik.  (*Id*. at 4.)  During these calls, Trooper Otterson spoke with Special Agent Fraik and Jerry Wilhelm, a gang investigator with the Minnesota Department of Corrections, about locating Mr. Fisher and a specific vehicle believed to be associated with Mr. Fisher.  (*Id*.)  They requested that Trooper Otterson attempt to stop the vehicle.  (*Id*.)

Trooper Otterson was provided with certain information to assist him in his search for Mr. Fisher and the vehicle.  Specifically, he had (1) a description of the vehicle, (2) the license plate of the vehicle, and (3) a description of Mr. Fisher, including pictures of him and his tattoos.  (*Id*.)  Regarding Mr. Fisher's alleged offenses, Trooper Otterson was informed that Mr. Fisher was believed to be "the highest-ranking Native Mob member in the State of Minnesota," and had allegedly "assaulted somebody with a firearm" only two days prior on July 25, 2016.  (*Id*.)  Trooper Otterson was also advised that it was believed Mr. Fisher still possessed the "pistol" connected to this assault.  (*Id*.)  Finally, he learned that a federal warrant was issued for Mr. Fisher's arrest and he was thought to be presently transporting a quantity of methamphetamine "from the metro area back to [Red Lake] reservation[.]"  (*Id*.)

For Mr. Fisher to reach Red Lake Indian Reservation, he was expected to traverse through Motley, Minnesota.  This information was obtained by tracking the location of Mr.

---

[1]      Trooper Otterson is also a certified narcotics detection K-9 handler.  Trooper Otterson's K-9 partner is named Busa.

Fisher's cellular phone pursuant to the tracking warrant.  (*Id*. at 5.)  Trooper Otterson was informed that Motley was Mr. Fisher's next expected destination and that there was a "pen order to trap and trace" his cellular phone's movements.  (*Id*.)  To intercept Mr. Fisher and the vehicle, Trooper Otterson began driving towards Motley.  (*Id*.)

While in route, Trooper Otterson observed a vehicle with the license plate matching the given description.  (*Id*.)  Trooper Otterson also observed that, based on his training and experience, the tint of the side windows of the vehicle was darker than permitted by Minnesota law.  (*Id*.)

Upon first observing the vehicle, Trooper Otterson executed a U-turn, and then proceeded to follow the vehicle.  (*Id*.)(citing Gov't's Ex. 1).)  He then activated his emergency lights to pull over the vehicle, a Chrysler 300.  (*Id*.)  After the Chrysler 300 pulled to the side of the road, Trooper Otterson approached the passenger's side of the vehicle, informed the occupants that he had stopped the vehicle for the "dark tint," and requested that the driver provide his driver's license and proof of insurance.  (*Id*.)  He observed that the car contained three occupants, one male driver, one male passenger, and one female passenger.  (*Id*.)  The male passenger—seated in the front seat—was identified by Trooper Otterson as Mr. Fisher, based on the given description.  (*Id*.)

While conducting the traffic stop, Trooper Otterson noticed certain signs that the vehicle's interior may contain hidden contraband.  (*Id*.)  He observed several air fresheners and multiple cell phones in plain view.  (*Id*.)  In his experience, air fresheners are often used to mask contraband odors, and drug traffickers often use a second phone to avoid detection. (*Id*.)  Notably, he also observed that the "molding" around the vehicle's dash radio and

console "appeared loose," which based on his training and experience, led him to believe that contraband may be hidden behind the dash panels of the vehicle.  (*Id.*)

Shortly thereafter, Trooper Otterson placed Mr. Fisher under arrest in light of his outstanding federal arrest warrant.  (*Id.* at 6.)  The driver of the vehicle was identified as Zebediah Gartner.  (*Id.*)  Although Mr. Gartner provided a driver's license, he claimed that he had no insurance on the vehicle and that the vehicle was recently purchased.  (*Id.*)  He then provided a title to the vehicle, but it was not in his name, and he claimed he did "did not know the person named on the title, nor did he know the person who had signed the back of the title."  (*Id.* at 6.)  Upon processing Mr. Gartner's information, Trooper Otterson discovered that his license was suspended, and there was also an outstanding warrant for his arrest.  (*Id.* at 6, 8.)  Consequently, Trooper Otterson placed him in handcuffs pending the verification of the arrest warrant.  (*Id.* at 6.)  While awaiting confirmation, Trooper Otterson questioned him and the female passenger separately as to the activities of the vehicle occupants that day.  (*Id.*)  Both gave contradicting accounts.  (*Id.*)

Moreover, the female passenger provided a false alias to Trooper Otterson.  (*Id.* at 6-7.)  After a second officer subsequently arrived on the scene, the female passenger was also placed under arrest.  (*Id.*)  The assisting officer then directed the female passenger to his patrol vehicle parked behind Trooper Otterson's patrol vehicle.  (*Id.*)

Once the female passenger was handcuffed, Trooper Otterson deployed his K-9 partner, Busa, to sniff the Chrysler 300.  (*Id.* at 7.)  Busa was led around the exterior of the vehicle, and "alerted" Trooper Otterson to the odor of narcotics at two locations: (1) the exterior of the passenger door seam, and (2) the open window seam.  (*Id.*)  When Trooper

Otterson led Busa around the vehicle again, Busa "alerted" at the same locations.  (*Id.*)  Busa also jumped into the front-passenger side of the vehicle, "scratching with both paws at the center console which," according to Trooper Otterson, is "behavior indicating the strongest source of the odor detected."  (*Id.*)

Once Busa "alerted" for narcotics, Trooper Otterson began searching the vehicle.  He searched the center console, which revealed a bag of pills, other drug paraphernalia, and an identification card for the female passenger, which identified her real name as "Morningstar Webster."  (*Id.*)  According to Trooper Otterson, the pills, later identified as Gabapentin pills,[2] were "wedged down" by Mr. Fisher's passenger seat.  (*Id.*)  Trooper Otterson next searched the vehicle's glove box.  (*Id.*)  He located a "used marijuana pipe" and loose marijuana sprinkled on a piece of paper.  (*Id.*)  Trooper Otterson searched the back seat.  (*Id.*)  He located a digital scale with "clear and crystalline residue."  (*Id.* at 8.)  Finally, Trooper Otterson searched the trunk.  (*Id.*)  He found three subwoofers, a digital scale, and luggage.  (*Id.*)  During his search of the vehicle, Trooper Otterson testified that he noticed several areas of the vehicle's trim that were either scratched or loose.  (*Id.*)  Based on his knowledge and experience, Trooper Otterson suspected that the trim had been manually tampered.  (*Id.*)

After the vehicle search, Trooper Otterson tested the vehicle's window tint.  (*Id.* at 8.)  The tint permitted only 35% light transmittance, which is below the legal minimum required limit of 50% light transmittance.  (*Id.*)  Afterwards, the Chrysler 300 was

---

[2]     Trooper Otterson testified that gabapentin is a narcotics addictive.

impounded and Mr. Fisher and Ms. Webster[3] were taken into custody. (*Id.*) Mr. Gartner, on the other hand, was released after the traffic stop. (*Id.*) He was cited for driving with a suspended license and issued a warning for excessive tint.[4] (*Id.*)

### 3.    Search of the Impounded Chrysler 300 on July 30, 2016

After the Chrysler 300 was towed to a secure garage at the State Patrol Office, Trooper Otterson and Special Agent Fraik suspected it still contained contraband. (*Id.* at 9.) Trooper Otterson believed marijuana was deliberately placed into the vehicle's console to mask the odor of other narcotics. (*Id.*) Consequently, Trooper Otterson wanted to "let the vehicle sit" with the "windows down and the doors open" to "air out" the vehicle so Busa could search the car again. (*Id.*)

On July 30, 2016, Trooper Otterson obtained a search warrant to search the Chrysler 300 because he thought obtaining a search warrant "would be best." (*Id.*) In his affidavit in support of his application, Trooper Otterson included all of the information the Special Agents had provided him, including a report from a confidential informant to Special Agent Fraik that Mr. Fisher would be transporting a large quantity of methamphetamine to northern Minnesota on July 27, 2016. (*Id.*)(citing Gov't's Ex. 4).) Trooper Otterson's affidavit also included a summary of his actions from the time he was contacted by the Special Agents through the traffic stop, which included a description of

---

[3]    Coincidentally, both Ms. Webster and the alias she provided had outstanding arrest warrants.

[4]    At the evidentiary hearing, Trooper Otterson testified that he did not issue a ticket for the tint violation at that time because he was unaware from the title provided who owned the vehicle. (*Id.* at 8.)

the K-9 sniff of the vehicle and his own observations of the loose panels and trim in the vehicle.  (*Id*. at 9-10.)  His affidavit further provided that, during his search of the vehicle, he had "found approximately 1.5 grams of NIK Positive Marijuana, a used pipe, a bag of unscheduled Gabapentin pills," and a "digital scale that NIK tested positive for METHAMPHETAMINE residue."  (*Id*. at 10.)

Based on this information, a Crow Wing County District Court Judge authorized the search of the Chrysler 300 while it was impounded.  (*Id*.)  After obtaining the search warrant, Trooper Otterson began removing all the items from inside the Chrysler, including certain luggage and three subwoofers.  (*Id*.)  He then brought Busa to perform a dog sniff.  (*Id*.)  Rather than performing his usual search pattern, Busa ran to the removed subwoofers.  (*Id*.)  Busa inserted his head inside its opening and scratched the speaker – an alert for narcotics odor.  (*Id*.)  When Trooper Otterson removed the faceplate, he discovered "two garbage bags or packages inside the subwoofers."  (*Id*.)  At the hearing, he testified that the substance inside the packages appeared to be methamphetamine.  (*Id*.)

### 4.        Search of Cellular Phones

On August 3, 2016, in light of Trooper Otterson's discovery, Special Agent Fraik applied for a search warrant for the contents of two cellular phones seized during the July 27, 2016 traffic stop.  (*Id*. at 10-11) (citing Gov't Ex. 5).)  In support of his application, Trooper Otterson's affidavit described details of the investigation, including "the arrest warrant issued for Mr. Fisher's arrest, the circumstances of the July 27, 2016 traffic stop, Trooper Otterson's initial locating of narcotics related items in the Chrysler 300 and his subsequently locating approximately 479 grams of methamphetamine during

the later July 30, 2016 search of the Chrysler 300 pursuant to a warrant; and the seizure of the two, subject cellular telephones during the traffic stop." (*Id.* at 11.) He further attested that, based on his training and experience, the quantity of methamphetamine recovered from the Chrysler 300 was consistent with "controlled substance trafficking and sales rather than" personal use, and persons engaged in the trafficking and sales of controlled substances often engage in conversations with "drug suppliers and drug customers via phone, e-mail, and other electronic media," and the information obtained from the two subject cellular phones would assist law enforcement in their investigation. (*Id.*)

On August 3, 2016, a Beltrami County District Court Judge authorized the search of the two cellular telephones, finding that probable cause existed to support the issuance of the search warrant. (*Id.*)

### 5.       Red Lake Search Warrant

On June 27, 2019, Criminal Investigator Ronald Leyba ("CI Leyba") of the Red Lake Police Department applied for a search warrant to search (1) a residence identified by address and referred to locally as the "Gitch" residence; (2) the persons of Richard Allen Clark, Sr. and Dezirae Rose Desjarlait; and (3) an SUV with a Leech Lake license plate, "Leech Lake plate 1123." (*Id.* at 11-12)(citing Gov't's Ex. 6 ("Red Lake search warrant")).) In support of his application, CI Leyba's affidavit detailed his ongoing investigation of the sale of narcotics at the "Gitch" residence "by the persons described in the affidavit," including Mr. Fisher. (*Id.* at 12.) The affidavit further described the circumstances regarding the purchases of controlled narcotics arranged and witnessed by

10

a confidential informant.  (*Id*.)

On June 27, 2019 a Judge of the Tribal Court for the Red Lake Indian Reservation found that probable cause existed to support the issuance of the Red Lake search warrant.  (*Id*.)  The search warrant was executed the same day.  (*Id*.)

When the search warrant was executed, Mr. Fisher was present at the subject residence.  (*Id*.)  He was arrested at that time, and he was subsequently charged with an offense in Red Lake Tribal Court.  (*Id*.)  After being charged, Mr. Fisher pled guilty in that court to the offense of possession with intent to distribute a controlled substance.  (*Id*.)

At the evidentiary hearing, Mr. Fisher testified that he believed the offense to which he pled guilty was related to the methamphetamine found during the execution of the Red Lake search warrant.  (*Id*.)  He further testified that he was "promised that it would stay on tribal grounds and tribal courts, that they would not turn it over to any state or federal government official and they would keep the case in tribal court . . ."  (*Id*.)

## II.    DISCUSSION

### A.    Standard of Review

Where a party objects to an R&R, the Court undertakes an independent, *de novo* review and "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."  28 U.S.C. § 636(b)(1) (2012); *see also* D. Minn. L.R. 72.2(b)(3).

### B.    Motion to Dismiss Count III of the Indictment

Mr. Fisher moves this Court to dismiss Count III of the Indictment.  Count III of the Indictment charges Mr. Fisher with one count of possession with intent to distribute

controlled substances.  [Doc. No. 1.]  It further alleges that, on June 27, 2019, Mr. Fisher "did knowingly and intentionally possess with intent to distribute 50 or more grams of methamphetamine (actual) . . ." (*Id.*)  As Judge Brisbois notes, this conduct is related to the June 27, 2019 search of the "Gitch" residence and the contraband found during the search of that residence.  (R&R at 13 n.9.)  As a result of the discovery of that contraband, Mr. Fisher was charged in Red Lake Tribal Court.  (*Id.*)  Specifically, he was charged "with the offense of possession with intent to distribute a controlled substance, and [he] ultimately pled guilty to that offense[.]"  (*Id.*)

Mr. Fisher moves to dismiss Count III, arguing that "the Double Jeopardy and Due Process Clauses of the Fifth Amendment" prohibit his prosecution for the "same crime" that he was prosecuted for in Red Lake Tribal Court.  (Def.'s Mem. [Doc. No. 31] at 13-14.)  The Court disagrees.  As Judge Brisbois correctly noted, the relief sought is precluded by the Supreme Court's decision in *United States v. Lara*, 541 U.S. 193 (2004).  (R&R at 13.)

In *Lara*, the Supreme Court found that when an Indian Tribe criminally prosecutes a nonmember Indian, the Indian tribe is exercising its inherent authority as a "sovereign" and not exercising any "federal power."  *Id*. at 198.  The Supreme Court therefore held that the Double Jeopardy Clause does not then prohibit the Federal Government from proceeding with the prosecution of federal offenses.  *Id*. at 210.  Judge Brisbois accordingly found Mr. Fisher's requested relief foreclosed by the holding in *Lara*.  (R&R at 13.)

In his Objections, Mr. Fisher generally asserts that Judge Brisbois erred in relying on *Lara* and preserves the issue for "further review" before the Eighth Circuit.  (*See* Def.'s

Obj. [Doc. No. 38] at 2.)

Based on the Court's independent, *de novo* review of the record and the applicable law, the Court overrules Mr. Fisher's Objection and denies his motion to dismiss Count III of the Indictment.

### C.   Motion to Suppress Evidence

In the R&R, Judge Brisbois separately addressed Mr. Fisher's motion to suppress the evidence obtained as a result of (1) the July 26, 2016 tracking warrant, (2) the July 27, 2016, roadside search of the Chrysler 300 during the traffic stop; (3) the July 30, 2016 search of the Chrysler 300 while it was impounded; (4) the August 5, 2016 search of the two cellular telephones seized during the July 27, 2016 traffic stop, and (5) the June 27, 2019 execution of the Red Lake search warrant at the "Gitch" residence.  (R&R at 14-33.) Judge Brisbois recommended the denial of all relief requested.  (*Id.*)

### 1.   July 26, 2016 Tracking Warrant

Mr. Fisher objects to the magistrate judge's ruling recommending that his motion to suppress be denied with respect to the July 26, 2016 tracking warrant.  He argues that, under *Carpenter v. United States*, __, U.S. __, 138 S. Ct. 2206 (2018), Special Agent Fraik was required to apply for a search warrant, supported by probable cause, to obtain the real-time location data authorized by the tracking warrant, which he failed to do.  Specifically, in his Objections, Mr. Fisher contends that because the tracking order references 18 U.S.C. § 3122, a provision in the Stored Communications Act ("SCA"), the more stringent Fourth Amendment probable cause standard was not met.  (Def.'s Obj. at 2-3.)  He contends that any evidence obtained as a result of the tracking warrant must be suppressed as fruit of the

poisonous tree.  (*Id*.)  The Court disagrees.

The Fourth Amendment states:

> The right of the people to be secure in their persons, houses,
> papers, and effects, against unreasonable searches and
> seizures, shall not be violated, and no Warrants shall issue, but
> upon probable cause, supported by Oath or affirmation, and
> particularly describing the place to be searched, and the
> persons or things to be seized.

U.S. Const. amend. IV.  In *Carpenter*, the Supreme Court held that a person has a legitimate

expectation of privacy in regard to his or her historical cell-site location information

("CSLI"), that review of historical CSLI data by law enforcement constitutes a search

under the Fourth Amendment, and that the government must obtain a search warrant based

on probable cause before it can acquire historical CSLI.  138 S. Ct. 2206.

The application at issue here seeks the installation of a pen register, or trap and trace

device, as well as "caller identification, electronic tracking device, and/or cellular tower

location and service information, including services such as Global Positioning System

technology, precision located related technologies and/or a tracking warrant[.]"  (Gov't's

Ex. 3.)  As Mr. Fisher concedes, the tracking warrant states that "there is reason to believe

that probable cause exists that the person who possesses an electronic device is committing,

has committed, or is about to commit a crime."  (Def.'s Obj. at 2.)

The Court finds that the application submitted by Special Agent Fraik in support of

this warrant was supported by probable cause.  His affidavit noted that (1) there was an

outstanding federal arrest warrant for Mr. Fisher; (2) the subject telephone number was Mr.

Fisher's last known phone number as provided by his probation officer assigned to his case;

(3) the probation officer had communicated with Mr. Fisher using that very same telephone number seven days prior to the warrant application; (4) the cell site location information would provide information as to Mr. Fisher's whereabouts; and (5) that said information would aid law enforcement in executing an outstanding felony warrant and lead to the arrest of Mr. Fisher.  (R&R at 17.)  Based on this sworn affidavit, the issuing judge found probable cause and authorized the search.  (*Id*.)

Moreover, as Judge Brisbois correctly notes, Special Agent Fraik's application differs from the type of SCA applications that were found to be insufficient under *Carpenter* for law enforcement to obtain historical CSLI. (R&R at 16-17.) "Traditional SCA applications only require certification, usually by an Assistant United States Attorney, that the information is relevant and material to the investigation." *United States v. Stachowiak*, No. 18-cr-298 (SRN/KMM), 2019 WL 2560519, at *5 (D. Minn. June 21, 2019) (citing *Carpenter*, 138 S.Ct. at 2231)).  "SCA applications are not typically accompanied by sworn affidavits from a law enforcement officer" like was done in this case. *Id.*

Based on this record, the Court finds that there was probable cause to support the issuing judge's decision to authorize the tracking warrant.   Accordingly, the Court overrules Mr. Fisher's Objection and denies his motion to suppress the evidence obtained as a result of the tracking warrant.

### 2.        July 27, 2016 Traffic Stop

Mr. Fisher moves this Court to suppress the information obtained pursuant to the July 27, 2016 traffic stop and subsequent search of the vehicle.  To advance his position,

he makes two arguments.  First, he argues that the search of the vehicle and the seizure of its occupants was the "fruit of the poisonous tree" from the "location data obtained without a warrant." (Def.'s Obj. at 5.)  He incorrectly contends that Judge Brisbois did not "address this issue." (*Id.*)  As Judge Brisbois notes, however, Mr. Fisher's "fruit of the poisonous tree argument" fails because the issuing judge had "a substantial basis to believe that [the tracking warrant] was supported by probable cause."  (R&R at 18 n.10.)

Mr. Fisher next objects to the magistrate judge's conclusion that it was proper for Trooper Otterson to stop Mr. Fisher to check for the purported "illegal tint" of the windows. (Def.'s Obj. at 5-6.)  He asserts that the evidence submitted at the hearing demonstrates that the "windows [of the vehicle] are clearly visible, and the observer ha[d] no trouble clearly seeing them."  (*Id.*)(citing Gov't's Ex. 1).)  He further contends that Trooper Otterson never gave him a ticket for tinted windows.  (*Id.*)  Consequently, he argues that the purported justification for the traffic stop was invalid.  (*Id.*)

It is well established that a traffic stop is a "seizure" within the meaning of the Fourth Amendment. *Delaware v. Prouse*, 440 U.S. 648, 653, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979).  For purposes of constitutional analysis, a traffic stop is characterized as an investigative detention, rather than a custodial arrest. *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984).  As such, a traffic stop is governed by the principles of *Terry v. Ohio*, 392 U.S. 1 (1968).  Generally, such a stop must be supported by at least a reasonable, articulable suspicion that the person stopped is involved in criminal activity.  *Prouse,* 440 U.S. at 663; *see also United States v. Arnold*, 835 F.3d 833, 838 (8th Cir. 2016) (citing *Terry*, 392 U.S. at 30)).  If there is an articulable and reasonable suspicion that any side or rear window is

impermissibly tinted under the law, a traffic stop on that basis is not unreasonable under the Fourth Amendment. *United States v. Travis*, No. 14-cr-253 (DSD/SER), 2015 WL 439393, at *1, 11 (D. Minn. Feb. 3, 2015); *United States v. Maurstad*, No. 18-cr-300 (1) (SRN/KMM), 2019 WL 4863451, at *3 (D. Minn. Aug. 21, 2019), *report and recommendation adopted*, 2019 WL 4862029 (D. Minn. Oct. 2, 2019).

Trooper Otterson's traffic stop on July 27, 2016 was supported by a reasonable, articulable suspicion that the windows appeared to be impermissibly tinted. He testified that he initiated the stop because he believed that the window tint on the Chrysler 300 was in violation of Minnesota law. He in fact informed the vehicle occupants that the suspected illegal window tint was the basis for the stop. (Gov't Ex. 1.) As Judge Brisbois notes, the "credibility of [his] belief is bolstered by the fact that the actual test of window tint of the Chrysler 300 demonstrated that the tint was outside of the spectrum permitted by the law in Minnesota." (R&R at 20.) Based on a *de novo* review of the present record, the Court finds no error in the magistrate judge's finding that Trooper Otterson's testimony was "credible" as to his initial belief that "the window tint on the Chrysler 300 was darker than allowed by law in Minnesota." (*Id.*) This justification merited a stop and further investigation. *McCarty*, 468 U.S. at 439.

Therefore, because the traffic stop was conducted properly, the Court overrules Mr. Fisher's Objection and denies his motion to suppress the evidence obtained as a result of that traffic stop.

### 3.        Search of the Impounded Chrysler 300

Mr. Fisher next moves this Court to suppress the evidence obtained as a result of the search of the impounded Chrysler 300. (Def.'s Obj. at 6-7.) In particular, he contends that the magistrate judge erroneously concluded that probable cause existed for the search of the vehicle three days after the initial traffic stop. (*Id.*) Although a warrant was obtained for the search of the impounded Chrysler 300, Judge Brisbois concluded that that warrant was "constitutionally superfluous." (R&R at 26 n.12.) Rather, Judge Brisbois found that the "search of the Chrysler 300 was constitutionally permissible pursuant to the automobile exception." (*Id.*)

"[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically and well-delineated exceptions." *United States v. Davis*, 569 F.3d 813, 816 (8th Cir. 2009) (citing *Katz v. Unites States,* 389 U.S. 347, 357 (1967)). One of these exceptions is the "automobile exception." *United States v. Williams*, 616 F.3d 760, 764 (8th Cir. 2012).

"[T]he 'automobile exception' permits the warrantless search of a vehicle if the police 'had probable cause to believe the vehicle contained contraband or other evidence of a crime before the search began.'" *United States v. Vore*, 743 F.3d 1175, 1179 (8th Cir. 2014) (quoting *United States v. Wells*, 347 F.3d 280, 287 (8th Cir. 2003)). "Probable cause sufficient to justify a search exists where, in the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Kennedy,* 427 F.3d 1136, 1141 (8th Cir. 2005). In making the probable cause determination, courts "apply a common sense approach and consider all relevant

circumstances." *Id.* "[P]robable cause may be based on the collective knowledge of all law enforcement officers involved in an investigation and need not be based solely upon the information within the knowledge of the officer on the scene if there is some degree of communication." *Wells,* 347 F.3d at 287.

The Court agrees with Judge Brisbois, and notes that, the methamphetamine "residue" found on the digital scale, combined with Trooper Otterson's suspicion that Mr. Fisher was transporting methamphetamine and that the odor of marijuana masked the scent of other narcotics at the initial traffic stop, gave him probable cause to search the impounded vehicle under the automobile exception.  (*See* R&R at 25) (citing *United States v. Brown*, No. 9-cr-145 (JNE/RLE), 2009 WL 2982934, at *12 n. 22 (D. Minn. Sept. 14, 2009) (involving a search of a vehicle that occurred three days after a traffic stop and declining to consider the merits of a search warrant to search the vehicle after concluding that the initial search, three days prior, was proper under the automobile exception); *United States v. Rodriguez,* 414 F.3d 837, 844 (8th Cir. 2005) ("[P]robable cause existed to search the entire vehicle, and a search pursuant to the automobile exception to the Fourth Amendment may take place at a separate place and time."); *see also United States v. John*s, 469 U.S. 478, 484 (1985) (upholding warrantless search of packages that occurred three days after the officers transported the trucks to the Drug Enforcement Administration headquarters and noting that "[a] vehicle in police custody may be searched on the basis of probable cause to believe that it contains contraband," and "[t]he justification to conduct such a warrantless search does not vanish once the car has been immobilized" or taken into police custody)).

Because the Court finds that the search of the impounded Chrysler 300 was valid, the Court overrules Mr. Fisher's Objection and denies his motion to suppress the evidence obtained as a result of that search.

### 4.        Search of Mr. Fisher's Seized Cellphone

Mr. Fisher next moves this Court to suppress the evidence obtained as a result of the search of his cellphone seized after the initial traffic stop.  (Def.'s Obj. at 8.)  His objection to the R&R directs the Court to consider his original brief in support of his motion to suppress evidence and asserts that the arguments set forth within that brief demonstrate why the magistrate judge erred.  (*Id.*)  He asserts—without additional argument— that the validity of the warrant issued for this search rests on "previous searches and seizures that were constitutionally infirm," rendering any evidence obtained "fruit of the poisonous tree."  (*Id.*)

The Court has undertaken an independent, *de novo* review of the record, the applicable law, and the magistrate judge's application of the law to the facts of this case. The Court finds no error and agrees with the magistrate judge's conclusions.  Because the Court finds that the search of Defendant's cellphone was valid, the Court overrules Mr. Fisher's Objection and denies his motion to suppress the evidence obtained as a result of that search.

### 5.        Red Lake Search Warrant

Finally, Mr. Fisher moves this Court to suppress the evidence obtained as a result of the Red Lake search warrant.  (Def.'s Obj. at 8.)  He first asserts that the magistrate judge erred in determining that the Red Lake search warrant was "self-authenticating"

20

pursuant to the Federal Rules of Evidence. (*Id*. at 8-9.) He further reiterates arguments set forth in his initial briefing regarding the warrant. (*Id*. at 9-10.) But this conclusory objection appears to overlook the persuasive authority upon which Judge Brisbois relied in which the court admitted a tribal court warrant "materially and substantially similar to the one at issue here." (R&R at 29-30)(citing *United States v. Jones*, No. 16-cr-170 (MJD/LIB), 2016 WL 7368200, at *7-9 (D. Minn. Oct. 3, 2016) (discussing the acceptance of search warrants issued by a Red Lake Tribal Judge and the authority of Tribal Judges to issue such warrants), *report and recommendation adopted*, 2016 WL 7366081 (D. Minn. Dec. 19, 2016)).

The Court overrules Mr. Fisher's Objection and denies his motion to suppress the evidence obtained as a result of this warrant.

## III. ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. The July 7, 2020 Report and Recommendation [Doc. No. 37] is **ADOPTED**;

2. Defendant's Objections to the July 7, 2020 Report and Recommendation [Doc. No. 38] are **OVERRULED**;

3. Defendant's Motion to Dismiss the Indictment [Doc. No. 22] is **DENIED** and Defendant's Motion to Suppress Search and Seizure Evidence [Doc. No. 25] is **DENIED**.

Dated:   August 14, 2020                         s/Susan Richard Nelson
                                                 SUSAN RICHARD NELSON
                                                 United States District Judge